**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James W Denby,<br><br>Plaintiff,<br><br>v.<br><br>American Family Insurance,<br><br>Defendant. | No. CV-17-02648-PHX-SMB<br><br>**ORDER** |

Pending before the Court is Defendant American Family Insurance's Motion for Summary Judgment, (Doc. 74), and Plaintiff James Denby's Partial Motion for Summary Judgment, (Doc. 76). Plaintiff moves for summary judgment on the breach of contract count, while Defendant moves for summary judgment on all counts. Oral argument was held on August 23, 2019. Both motions are fully briefed and ripe for ruling.

**I.  BACKGROUND**

Defendant issued a homeowner's policy to Plaintiff effective April 9, 2014 to April 9, 2015 (the "Policy") for Plaintiff's residence located in Casa Grande, Arizona (the "Residence"). The Policy provided replacement cost coverage for the dwelling in the amount of $189,200 and for personal property on the premises in the amount of $141,900. Within the Policy is a provision that limits coverage for certain costs incurred "due to the enforcement of any ordinance, law, or regulation," as well as a provision which limits certain coverage involving land. (Doc. 75-2 at 4, 22).

On December 17, 2014, the Casa Grande Police Department and Pinal County Regional SWAT caused damage to the Residence and Plaintiff's personal property while trying to apprehend a domestic violence suspect. Plaintiff reported the damage to Defendant on the same day. The claim was assigned to Defendant's adjuster Logan Perrill to investigate, evaluate, and settle. On December 19, 2014, Defendant retained independent adjuster Silverado Claims to contact Plaintiff and inspect the Residence. On December 29, 2014, Silverado Claims reported its findings from an initial inspection of the Residence which was conducted on December 23, 2014.

On February 17, 2015, Defendant reviewed the Silverado Claims report which provided an estimate to repair the Residence. According to Silverado Claims, the cost to repair the Residence was $65,230.97, with an actual cash value of $30,085.67. The estimated cost to repair the separate guesthouse was $1,234.22, with an actual cash value $411.41. On February 19, 2015, Defendant noted that it had opportunity to review estimates by Silverado Claims, EFI Global (retained to provide a report on structural damage), American Technologies, Inc. (retained to compare the estimate for mitigation of the Residence prepared by Silverado Claims), and Service Master Casa (retained to develop protocol to clean the Residence). On the same day, Defendant informed Plaintiff of the results of its investigation and told him it would issue payment based on the estimates in the reports. Plaintiff informed Defendant that Flood Impact Experts and Arizona Indoor Environmental Testing advised him the Residence should be destroyed and completely rebuilt. Plaintiff believed he was entitled to the full replacement cost policy limits under the Policy. Defendant tendered four checks to Plaintiff totaling $65,571.30 for settlement.

On April 23, 2015, Defendant sent Plaintiff a letter that copied and pasted sections of the Policy and also contained the following paragraph:

> Your Homeowner's policy limits the amount of coverage available to you in regards to the increased cost of repairs or replacement as required by ordinance, law, or regulation. The policy only provides coverage for upgrades to the system or building material that was damaged as a result of the covered loss. In regards to your specific loss, the plumbing, electrical,

> truss, and floor joist systems found in your home were not directly damaged by the release of tear gas or intrusion of tear gas projectiles. Your homeowner's policy also specifically excludes coverage for land and the value of land which applies specifically to the testing, removing, or replacement of soils at your property.

(Doc. 75-8 at 2). On April 30, 2015, Plaintiff retained James F. O'Toole Co., Inc. to assist in the adjustment of his claim. On May 8, 2015, Defendant provided O'Toole with a copy of repair estimates from its vendors. On May 11, 2015, O'Toole submitted an estimate to completely demolish and rebuild the Residence. On May 18, 2015, Defendant reviewed the estimate and sent a response to O'Toole disputing the amount of their estimation. On May 21, 2015, O'Toole demanded appraisal under the Policy's Appraisal Clause.[1] The disagreement that led to Plaintiff invoking the appraisal process was over whether the house should be razed and rebuilt or whether it could be repaired to its pre-loss state. O'Toole hired Joe Rezzonico as the appraiser and Defendant retained Grant Trussler as its appraiser. A hearing was held on March 31, 2016. Rezzonico and the umpire signed an appraisal award for the dwelling of $177,500 replacement cost and $142,000 actual cash value (the "Appraisal Award"). As for the contents, Plaintiff was awarded $23,613 replacement cost and $23,131 actual cash value. The award was stated in lump sum amounts and was not itemized. Defendant asserts that it was unable to determine the amount of the covered loss based upon the lump sum Appraisal Award because the costs for uncovered damages were not itemized.

The parties dispute whether Trussler, Defendant's appraiser, stressed to the umpire during the appraisal process that the award needed to be broken down so that Defendant could review for coverage issues. After the hearing, on April 15, 2016, Defendant requested the appraisal panel to modify the Appraisal Award so Defendant could pay the covered portion of the loss. On April 25, 2016, Defendant again followed up on its request for a breakdown of the Appraisal Award, but the breakdown was not provided. On August 16, 2017, Defendant issued an additional payment of $24,369.68 to Plaintiff's counsel.

---

[1] The Policy's Appraisal Clause is quoted below in Section III.A.2.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). The court need only consider the cited materials, but it may also consider any other materials in the record. *Id.* 56(c)(3). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. If the movant fails to carry its initial burden, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If the movant meets its initial responsibility, the burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact. *Id.* at 1103. The nonmovant need not establish a material issue of fact conclusively in its favor, but it "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 247–48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations

omitted). However, in the summary judgment context, the Court believes the nonmovant's evidence, *id.* at 255, and construes all disputed facts in the light most favorable to the nonmoving party, *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). If "the evidence yields conflicting inferences [regarding material facts], summary judgment is improper, and the action must proceed to trial." *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).

### III. ANALYSIS

#### A. Breach of Contract

In the Complaint, Plaintiff alleges that Defendant breached the Policy by failing to provide benefits to Plaintiff as provided for in the Policy. Both Plaintiff and Defendant move for summary judgment on Plaintiff's breach of contract claim. Plaintiff asserts that it is entitled to summary judgment because there is no dispute that Plaintiff properly invoked the appraisal provision of the Policy and followed the specified procedures; that the umpire and one of the appraisers agreed on the amount of the loss and signed the Appraisal Award; and that Defendant has not paid the full amount of the loss as stated in the Appraisal Award to Plaintiff. Defendant does not appear to contest any of Plaintiff's assertions, but rather states that it was unable to pay the Appraisal Award because there were coverage issues and the award was presented as a lump sum. Defendant asserts that it is entitled to summary judgment because Plaintiff has not provided any evidence disputing that the amount already paid to him is "accurate for the covered damages." (Doc. 74 at 12).

Much of the caselaw presented by counsel involves disputes between parties arising prior to the parties entering the appraisal process. This case presents unique questions however because the parties agreed to enter the appraisal process and now dispute whether Defendant is contractually obligated to pay the full "amount of loss" as determined by the Appraisal Award.

#### 1. *Legal Standard*

Under Arizona law, a court's "purpose in interpreting a contract is to ascertain and

enforce the parties' intent." *ELM Ret. Ctr., LP v. Callaway*, 246 P.3d 938, 941 (Ariz. Ct. App. 2010). "To determine the parties' intent, we 'look to the plain meaning of the words as viewed in the context of the contract as a whole.'" *Id.* at 941–42 (quoting *United Cal. Bank v. Prudential Ins. Co.*, 681 P.2d 390, 411 (Ariz. Ct. App. 1983)). "Contracts are 'to be read in light of the parties' intentions as reflected by their language and in view of all circumstances; if the intention of the parties is clear from such a reading, there is no ambiguity.'" *In re Estate of Lamparella*, 109 P.3d 959, 963 (Ariz. Ct. App. 2005), *as amended* (June 20, 2005) (quoting *Harris v. Harris*, 991 P.2d 262, 265 (Ariz. Ct. App. 1999)). "Language in a contract is ambiguous only when it can reasonably be construed to have more than one meaning." *Id.* "When the terms of a contract are plain and unambiguous, its interpretation is a question of law for the court." *ELM*, 246 P.3d at 942. "[W]here the provisions of the contract are plain and unambiguous upon their face, they must be applied as written, and the court will not pervert or do violence to the language used, or expand it beyond its plain and ordinary meaning or add something to the contract which the parties have not put there." *Heard v. Farmers Ins. Exch. Co.*, 496 P.2d 619, 621–22 (Airz. Ct. App. 1972) (emphasis omitted). "[A] court should not interpret a contract so as to render meaningless the language used by the parties, if a reasonable construction can be effected utilizing all the language of the contract." *Tucker v. Byler*, 558 P.2d 732, 735 (Ariz. Ct. App. 1976). "If the contract language is reasonably susceptible to more than one meaning, extrinsic evidence may be admitted to interpret the contract." *ELM*, 246 P.3d at 942.

### 2. *Analysis*

The parties agree that the Residence was covered by the Policy and that the following appraisal clause was included within the Policy:

> **Appraisal.** If you and we fail to agree on the *amount of loss*, either may demand an *appraisal of the loss*. In this event, each party will choose a competent and disinterested appraiser within 20 days after receiving a written request from the other. The two appraisers will choose a competent and disinterested umpire. . . . The appraisers will separately set the *amount of*

> *loss*. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the *amount of loss*. If they fail to agree within a reasonable time, they will submit their differences to the umpire. Written agreement signed by any two of these three will set the *amount of the loss*. The party selecting that appraiser will pay each appraiser. Other expenses of the appraisal and the compensation of the umpire will be paid equally by you and us.

(Doc 75-2 at 26) (emphasis added) (the "Appraisal Clause"). Throughout the Appraisal Clause, it is clear that the appraisal panel would determine the "amount of loss." The "amount of loss" usually denotes the amount it would cost to repair damage, irrespective of coverage questions. For example, in *Ori v. American Family Mutual Insurance Co.*, No. CV-2005-697-PHX-ROS, 2005 WL 3079044, at *1 (D. Ariz. Nov. 15, 2005), this District considered a similar appraisal clause in considering the plaintiff's motion to compel arbitration. The insurer appraised the loss at the insured's home due to a fire at $8,310.43, while the insured appraised the loss at $63,289.33. *Id.* "The difference in [the] estimates [was] largely due to disagreement about whether the ceiling need[ed] to be dropped to remove the smoke odor, whether the entire home need[ed] to be repainted and the carpet re-cleaned, and whether all of the furniture need[ed] to be removed, stored, and replaced." *Id.* The court noted that "[t]he difference between the two figures stem[ed] from the parties' disagreement about the repairs necessary to restore the home to its pre-fire state," and held that this type of disagreement "is a disagreement about the 'amount of loss' and is subject to arbitration." *Id.* at *4. The case at hand presents a factual situation similar to that in *Ori*—the appraisal panel here was invoked to resolve differences in the parties' estimates of what was needed to repair the damage to the Residence. Plaintiff's appraiser believed a rebuild was necessary, while Defendant's belief was that repairs could be accomplished without a rebuild.

But Defendant's contention is that within the "amount of loss" determined by the appraisal panel, there are repairs that are not "covered" by the Policy. In similar cases, insurers have been able to argue coverage of such repairs after the appraisal process. *See, e.g., Speros v. Sentinel Ins. Co. Ltd.*, No. CV-14-00224-PHX-JJT, 2018 WL 1536389, at

*5 (D. Ariz. Mar. 29, 2018) (noting "that the Appraisal Award in this instance is itemized, and any individual portion of the appraised amount that exceeded the appraisers' authority by providing a value for damage beyond that contemplated by the policy, or for some other reason, is not binding on the parties"). Courts have held that it is within defendants' rights to contest damage estimates for areas of repairs that they determine were not "covered" by the policy. *See 6700 Arrowhead Owners Ass'n v. State Farm Fire & Cas. Co.*, No. CV-12-1677-PHX-DGC, 2012 WL 5868969, at *3 (D. Ariz. Nov. 19, 2012) (granting insured's motion to compel arbitration and ordering that the appraisal award be itemized to allow the insured "to litigate coverage issues after the appraisal—something it is entitled to do"); *see also Arvat Corp. v. Scottsdale Ins. Co.*, No. 14-22774, 2015 WL 6504587, at *2 (S.D. Fla. Oct. 28, 2015) ("After the appraiser makes a determination as to the amount of loss attributable to each cause, Defendant may still challenge coverage."); *Liberty Am. Ins. Co. v. Kennedy*, 890 So. 2d 539, 541–42 (Fla. Dist. Ct. App. 2005) ("[T]he submission of [a] claim to appraisal does not foreclose [the insurer] from challenging an element of loss as not being covered by the policy.").

Further supporting Defendant's ability to challenge coverage of repairs included in the "amount of loss" is Arizona case law stating that the "[t]he function of appraisers is to determine the amount of damage resulting to various items submitted for their consideration. It is certainly not their function to resolve questions of coverage and interpret provisions of the policy." *Hanson v. Commercial Union Ins. Co.*, 723 P.2d 101, 103 (Ariz. Ct. App. 1986); *see also 6700 Arrowhead*, 2012 WL 5868969, at *2 (noting that the distinction between "determinations about the scope of coverage under the insurance policy" and "determining the amount of damage" is important "because in Arizona appraisers only determine the amount of damage and do not resolve questions of coverage").

"[T]here is a dichotomy between the issue of coverage and the issue of valuation of a covered loss." *Liberty Am.*, 890 So. 2d at 541. There is no question here that Plaintiff and Defendant disagreed on how much it was going to cost to complete the necessary

repairs—a matter regularly decided through the appraisal process. But according to cases in Arizona, submission to such appraisal process does not preclude Defendant from challenging the "amount of loss" if it believes the amount includes losses not covered by the Policy.

Plaintiff also argues that Defendant did not raise possible coverage issues until after the appraisal, arguing it "was all a ruse contrived after the appraisal in a desperate effort to relieve Defendant of its obligations under the Policy." (Doc. 84 at 3). But the evidence shows otherwise. In an April 23, 2015 letter from Defendant to Plaintiff, Defendant reported the dollar amount it estimated for repairs and noted that Plaintiff's Policy had limitations regarding code upgrades as well limitations on coverage for certain land and soil matters. (Doc. 75-8). The evidence does not show that Defendant contemplated paying for repairs not covered by the Policy. And in looking at the context of the contract as a whole, the contract does not contemplate any payment for losses not considered as covered by the Policy.

What remains is a question of fact—whether Defendant breached the contract by not paying Plaintiff for covered losses. Plaintiff argues that Defendant does not show that there are "uncovered" losses included in the Appraisal Award. But at the same time, Plaintiff has not shown that all losses are covered.[2] As such, a question of fact remains as to whether the Appraisal Award includes uncovered losses and summary judgment must be denied to both Plaintiff and Defendant.

### B. Bad Faith/Breach of Implied Covenant of Good Faith

#### 1. *Legal Standard*

Arizona recognizes the tort of insurance bad faith. *See Deese v. State Farm Mut. Auto. Ins. Co.*, 838 P.2d 1265, 1267 (Ariz. 1992) (noting that the Arizona Supreme Court first recognized the tort of bad faith in 1981). "[T]here is a legal duty implied in an

---

[2] The only evidence submitted by Plaintiff is deposition testimony from its appraiser, Joe Rezzonico, concerning whether the lump sum award included certain types of uncovered repairs. Rezzonico's testimony included responses such as "I don't believe it was part of the award" and "I don't think so," which is not on its own enough to establish that the Appraisal Award did not include uncovered repairs.

insurance contract that the insurance company must act in good faith in dealing with its insured on a claim, and a violation of that duty of good faith is a tort." *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981). "The tort of bad faith arises when the insurer 'intentionally denies, fails to process or pay a claim without a reasonable basis.'" *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279 (Ariz. 2000) (quoting *Noble*, 624 P.2d at 868).

To establish bad faith on the part of the insurer, "a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Deese*, 838 P.2d at 1267–68 (quoting *Noble*, 624 P.2d at 868); *see also Echanove v. Allstate Ins. Co.*, 752 F. Supp. 2d 1105, 1109 (D. Ariz. 2010) ("To prove their claim for bad faith, plaintiffs must show that [the insurer's] handling of their claim was unreasonable and that [the insurer] intended to act unreasonably towards the Plaintiffs."). "The first inquiry involves an objective analysis that focuses on whether the insurer acted unreasonably, while the second involves a subjective analysis as to 'whether the insurer *knew* that its conduct was unreasonable or acted with such reckless disregard that such knowledge could be imputed to it.'" *Young v. Allstate Ins. Co.*, 296 F. Supp. 2d 1111, 1115 (D. Ariz. 2003) (quoting *Deese*, 838 P.2d at 1265 (emphasis in original)). "[I]f an insurer's conduct is reasonable or fairly debatable, there is no liability for bad faith." *Echanove*, 752 F. Supp. 2d at 1110.

"Generally, an insurer's founded belief is a question of fact to be determined by the jury." *Temple v. Hartford Ins. Co. of Midwest*, 40 F. Supp. 3d 1156, 1169 (D. Ariz. 2014) (citing *Zilisch*, 995 P.2d at 279). "However, if [the plaintiff] has offered no significantly probative evidence that calls into question the insurer's subjective founded belief, the Court may rule on the issue as a matter of law." *Id.*

### 2. *Analysis*

Only Defendant moves for summary judgment on the bad faith claim. Defendant argues that Plaintiff cannot show as a matter of law that Defendant's conduct lacked "a reasonable basis" or that it "knew its conduct was unreasonable." (Doc. 74 at 13–14).

In his Complaint, Plaintiff alleges that Defendant acted in bad faith by "failing to provide benefits as provided for in the Policy" and "failing to compensate Plaintiff for loss as determined by the Appraisal Award." (Doc. 1-1 ¶¶ 107–108). Plaintiff argues that there is "abundant evidence that Defendant acted in bad faith." (Doc. 84 at 15).

Plaintiff first argues that Defendant did not participate in the appraisal process in good faith because it predetermined that it would not pay any cost associated with tearing down and rebuilding, even though such costs were not excluded from the Policy. (Doc. 84 at 15). In support, Plaintiff points to deposition testimony of Charles Bushman, Defendant's Property Field Claims Manager, which includes the following statements:

- From the day that [Mr. O'Toole's estimate] was received, Monday, May 11, 2015, until the 18th, which was one week, the adjuster Logan Perrill reviewed this and rejected it because it was ridiculous to tear down a house that could be repaired for less than a hundred thousand dollars. So -- so the answer to your question is, nobody went through to review this estimate to see what was covered and what was not because it was thoroughly ridiculous to tear down this house and rebuild it from the ground up when it could be repaired for the amount that we had estimated. So we rejected his estimate, and immediately he demanded an appraisal.

- We received Mr. O'Toole's estimate and we said that we felt like that -- the $300,000 to totally demolish and rebuild the house was a ridiculous amount of money and a ridiculous repair for what could be repaired for a significant amount less than that.

- [Without an itemized estimate of the award], we were not able to comprehend how the appraisal panel came up with an estimate to demolish and rebuild Mr. Denby's house when it could be repaired for significantly less than that.

(Doc. 85-3).

Plaintiff also argues that it was unreasonable and reckless for Defendant to delay payment of the "undisputed" portion of Plaintiff's claim, citing again to Bushman's deposition testimony. (Doc. 84 at 15). Plaintiff refers to the $24,369.68 that Defendant paid to Plaintiff in August 2017, after the Appraisal Award was issued. Bushman testified that after Defendant did not receive an itemization of the Appraisal Award, they reviewed

1  the original 2015 estimate from Mr. O'Toole and came up with what they "felt like was a
2  good faith, undisputed total amount of the repairs to Mr. Denby's home based on the
3  coverage he had at the time of the loss." (Doc. 85-3 at 3).

4  Plaintiff further argues that Defendant ignored the advice of its own experts related
5  to tear gas, trying to reduce the payment amount. (Doc. 84 at 15–16). Plaintiff states that
6  neither Perrill or Bushman had experience with claims involving tear gas cannisters, citing
7  each of their deposition testimonies. (Doc. 85 ¶ 12).

8  "Generally, an insurer's founded belief is a question of fact to be determined by the
9  jury," *Temple*, 40 F. Supp. 3d at 1169, and Plaintiff has provided sufficient probative
10 evidence showing genuine issues of material fact that preclude summary judgment on the
11 Bad Faith claim.

### C. Punitive Damages

"To recover punitive damages, the plaintiff must show something more than the conduct necessary to establish the tort of bad faith." *Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*, 277 P.3d 789, 801 (Ariz. Ct. App. 2012) (citation and internal quotation marks omitted). In order to show "something more," a plaintiff must "prove that defendant's evil hand was guided by an evil mind." *Id.* (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz. 1986)). An "evil mind" may be found where (1) "defendant intended to injure the plaintiff" or (2) "defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Id.* (quoting *Rawlings*, 726 P.2d at 578). An "evil mind" may be inferred "[w]hen defendant's motives are shown to be so improper, or its conduct so oppressive, outrageous or intolerable[.]" *Rawlings*, 726 P.2d at 578–79. A motion for summary judgment "must be denied if a reasonable jury could find the requisite evil mind by clear and convincing evidence" and "should be granted if no reasonable jury could find the requisite evil mind by clear and convincing evidence." *Thompson v. Better-Bilt Aluminum Prods. Co.*, 832 P.2d 203, 211 (Ariz. 1992).

Plaintiff argues that "Defendant's predetermination that it would not pay to demolish and rebuild the house, Defendant's gross delay in making payment to [Plaintiff],

Defendant[']s continuing efforts to low-ball [Plaintiff] and refusing to follow the suggestions of its own experts more than amply justify the submission of punitive damages to the jury." (Doc. 84 at 17). However, Plaintiff has not shown "something more" than evidence supporting the tort of bad faith. Defendant's request for summary judgment on the punitive damages claim is granted.

### D. Unfair Settlement Practices

In the Complaint, Plaintiffs alleges "Unfair Settlement Practices" in violation of A.R.S. §§ 20-461, -462. (Doc. 1-1 ¶¶ 126–130). Defendant asserts in its motion that this claim is meritless citing to subsection D:

> Nothing contained in this section is intended to provide any private right or cause of action to or on behalf of any insured or uninsured resident or nonresident of this state. It is, however, the specific intent of this section to provide solely an administrative remedy to the director for any violation of this section or rule related to this section.

A.R.S. § 20-461(D). Indeed, the Arizona Unfair Claim Settlement Practices Act is "intended to provide solely an administrative remedy and ha[s] no applicability to an insured's claim against his insurance company." *Melancon v. USAA Cas. Ins. Co.*, 849 P.2d 1374, 1377 (Ariz. Ct. App. 1992).

Plaintiff failed to even address Defendant's argument, let alone provide any evidence showing a genuine dispute of material fact on this claim. Accordingly, the Court finds in favor of Defendant on the Unfair Settlement Practices claim.

### E. Breach of Fiduciary Duty

Defendant argues that Plaintiff cannot assert a claim for breach of fiduciary duty because "[a]n insurer is not a fiduciary, so there is no basis for breach of fiduciary claim." (Doc. 74 at 17). Defendant cites to *Rawlings v. Apodaca*, 726 P.2d 565, 571 (Ariz. 1986). In *Rawlings*, the court said that

> although the insured is entitled to expect that the insurer will be 'on his side' at least to the extent of treating him honestly and fairly, we do not go so far as to hold that the insurer is a

- 13 -

> fiduciary, but do hold that it has some duties of a fiduciary nature. Equal consideration, fairness and honesty are among them.

*Id.* (citation omitted). In response, Plaintiff also cites to *Rawlings* and points to *Rawlings* declaration that an insurer "has some duties of a fiduciary nature." *Id.*

While it is true "that an insurer owes certain duties to the insured beyond those that normally would be imposed by the existence of contract," such as the duty to "play fairly with its insured" and "duties of equal consideration and honesty," "the correct cause of action for an alleged breach of these duties falls under the implied covenant of good faith and fair dealing." *Hazel v. Life Ins. Co. of N. Am.*, No. 4:13-CV-00248-DCB, 2014 WL 12538175, at *2 (D. Ariz. Mar. 7, 2014) (citing *Rawlings*, 726 P.2d at 570–71). Courts have held that a breach of fiduciary duty claim by an insured against its insurer fails as a matter of law. *See Nat'l Fire & & Marine Ins. Co. v. Infini PLC*, No. CV-16-03874-PHX-GMS, 2019 WL 95894, at *6 (D. Ariz. Jan. 3, 2019) (holding that insured's "breach of fiduciary duty claim against [insurer] fail[ed] as a matter of law"); *Kovacs v. Sentinel Ins. Co. Ltd.*, No. CV-16-00964-PHX-DGC, 2016 WL 3570475, at *2 (D. Ariz. July 1, 2016) ("Because Plaintiff can enforce his rights to equal consideration, fairness, and honesty in a bad faith claim, and Defendant owed him no other duties, Plaintiff's freestanding fiduciary duty claim fails as a matter of law."); *see also Am. United Life Ins. Co. v. Broatch*, No. CV-13-00956-PHX-DLR, 2014 WL 11514479, at *7 (D. Ariz. Aug. 29, 2014) (finding that insurer was "entitled to summary judgment [on the breach of fiduciary duty claim] because it did not stand in a fiduciary relationship" with the insured).

Accordingly, summary judgment is granted to Defendant on the breach of fiduciary duty claim.

### F. Negligence

Defendant argues that Plaintiff cannot maintain a negligence action because "[a]n insured may only recover tort damages if the insurer's conduct rises to the level of bad faith." (Doc. 74 at 17). Under Arizona law, an "insurer's mishandling of a claim does not give rise to a claim for simple negligence." *Meineke v. GAB Bus. Servs., Inc.*, 991

P.2d 267, 271 (Ariz. Ct. App. 1999) (citing *Miel v. State Farm Mut. Auto. Ins. Co.*, 912 P.2d 1333, 1340 (Ariz. Ct. App. 1995)). Rather, "[i]f the insurer mishandles a claim, its insured may be entitled to recover compensatory damages for breach of contract, or damages in tort if the insurer's actions rise to the level of bad faith." *Id.*

Plaintiff again failed to address Defendant's argument, let alone provide any evidence showing a genuine dispute of material fact on this claim. Accordingly, summary judgment is granted to Defendant on the Negligence claim.

**IT IS ORDERED** DENYING Plaintiff's Motion for Partial Summary Judgment. (Doc. 76).

**IT IS FURTHER ORDERED** GRANTING IN PART and DENYING IN PART Defendant's Motion for Summary Judgment. (Doc. 74). Summary judgment is GRANTED to Defendant on the claims of Punitive Damages, Unfair Settlement Practices, Breach of Fiduciary Duty, and Negligence. Summary judgment is DENIED on the claims of Breach of Contract and Bad Faith/Breach of Implied Covenant of Good Faith.

Dated this 29th day of August, 2019.

_____
Honorable Susan M. Brnovich
United States District Judge